STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Dwight M. SANDERS, Defendant-Appellant.

Supreme Court

*No. 2006AP2060–CR. Oral argument December 12, 2007.*
*—Decided July 9, 2008.*

2008 WI 85

(Also reported in 752 N.W.2d 713.)

For the plaintiff-respondent-petitioner the cause was argued by *Anne C. Murphy,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Patrick M. Donnelly,* assistant state public defender.

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. The State seeks review of a published court of appeals decision reversing an order and judgment of the Circuit Court for Racine County, Dennis J. Barry, Judge.[1] The circuit court denied defendant Dwight M. Sanders' motions to suppress both physical evidence and statements that law enforcement officers obtained following a warrant-less entry into the defendant's home and two subse-quent warrantless searches of the defendant's bedroom. The defendant was convicted of possession of cocaine with intent to deliver as a second offense and as a

---

[1] *State v. Sanders,* 2007 WI App 174, 304 Wis. 2d 159, 737 N.W.2d 44.

habitual offender contrary to Wis. Stat. §§ 961.41(1m)(cm)1r., 961.48, and 939.62 (2005–06).[2]

¶ 2. In reversing the circuit court's order and judgment, the court of appeals concluded that the law enforcement officers' warrantless entry into the defendant's home violated the defendant's rights under the Fourth Amendment to the United States Constitution[3] applicable to the states under the Fourteenth Amendment. We affirm the decision of the court of appeals but on different grounds.

¶ 3. The determinative issue on review is whether the circuit court erred in denying the defendant's motions to suppress the physical evidence that law enforcement officers obtained following a warrantless entry into the defendant's home to make a warrantless arrest and two subsequent warrantless searches of his bedroom.[4] This issue turns on the answer to the following question: Are the law enforcement officers' two

---

[2] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

[3] The Fourth Amendment to the United States Constitution provides in full:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[4] Accordingly, we need not address the issue the court of appeals decided, namely, whether the law enforcement officers' warrantless entry into the defendant's home to make a warrantless arrest was justified as an exception to the Fourth Amendment warrant requirement.

The initial entry into the defendant's home to arrest the defendant, the searches of the defendant's bedroom, the search of a canister in the defendant's bedroom, and the seizure of the

warrantless searches of the defendant's bedroom justified (respectively) under the "protective sweep" and "search incident to arrest" exceptions to the Fourth Amendment warrant requirement?

¶ 4. The court concludes that although the first warrantless search of the defendant's bedroom may have been justified under the "protective sweep" exception to the Fourth Amendment warrant requirement, the second search of the bedroom was not justified under the "search incident to arrest" exception to the Fourth Amendment warrant requirement. The court further concludes that the search of the canister found in the bedroom and seizure of its contents were not justified under either exception to the Fourth Amendment warrant requirement.

¶ 5. For the reasons set forth, we affirm the decision of the court of appeals reversing the circuit court's order denying the defendant's motion to suppress and reversing the circuit court's judgment of conviction.

I

¶ 6. We briefly summarize the facts relating to the officers' obtaining possession of the evidence that the defendant moved to suppress.

¶ 7. Two City of Racine police officers, Officers Garcia and Anderson, were dispatched to a residence on a complaint of cruelty to animals. As the officers arrived, they heard a dog yelping and proceeded to the

---

contents of the canister were all nonconsensual in the instant case. The instant case does not address consensual searches or seizures.

The State's brief concentrates on suppression of the physical evidence and makes little mention of the defendant's statements. The assumption seems to be that if the physical evidence is suppressed so are the defendant's alleged statements.

yard behind the residence. There, the officers observed four people, one of whom was the defendant, along with three or four dogs. Officer Garcia testified that he did not notice any signs of mistreatment or injury to the dogs.

¶ 8. Officer Anderson advised the defendant of the animal cruelty complaint and made multiple requests for the defendant to identify himself. The defendant responded to each of these requests by saying that he had done nothing wrong. According to Officer Anderson, the defendant objected to the officers' conduct, saying that "this [is] bullshit."

¶ 9. As the officers conversed with the defendant, they observed that the defendant was holding folded-up bills of currency[5] as well as a yellow and black canister later revealed to be a beef jerky canister.

¶ 10. Officer Garcia testified that the defendant's residence was not a known drug house, that Officer Garcia had had no prior dealings with the defendant, that Officer Garcia was unaware at the time whether the defendant had a history of drug trafficking, and that Officer Garcia observed neither a controlled substance nor a drug transaction in the defendant's back yard. Officer Garcia also testified that the defendant's residence is located in a known drug trafficking area and that it was "not unusual" for persons to conceal controlled substances in canisters "similar to" the beef jerky canister that the officers observed in the defendant's hand.

¶ 11. Officer Anderson attempted to detain the defendant with handcuffs. At oral argument in this court, the State characterized this attempted detainer

---

[5] The record does not indicate how much money the officers observed in the defendant's hand.

not as an attempted arrest upon probable cause but instead as an attempted seizure justified under the United States Supreme Court's decision in *Terry v. Ohio,* 392 U.S. 1 (1968). The defendant has not challenged the lawfulness of Officer Anderson's attempt to detain the defendant, and the State has not briefed the validity of Officer Anderson's conduct as a *Terry* stop. For purposes of this appeal, we assume that the attempted detainer was justified under *Terry.*

¶ 12. When Officer Anderson attempted to detain the defendant, the defendant moved away from the officers and then ran into his home through the rear door. At some point while the defendant was moving toward his home, Officer Anderson ordered the defendant to stop. The defendant did not stop.

¶ 13. The officers pursued the defendant, following him into his home. The defendant ran into a bedroom and shut the door behind him. Officer Garcia and Officer Anderson each testified that the purpose of following the defendant into his home was to take the defendant into custody. Each officer also testified that he did not believe evidence of any crime would be discovered inside the defendant's home.

¶ 14. After approximately one minute or less, the defendant voluntarily exited the bedroom. Officer Garcia testified that he then ordered the defendant to the ground and that the defendant did not obey this order. Chemical spray was applied to the defendant.[6] The defendant fell to the ground and was handcuffed.[7]

---

[6] The record does not show which officer applied the chemical spray.

[7] The record does not show which officer handcuffed the defendant.

¶ 15. Officer Garcia testified that after the defendant was handcuffed, Officer Garcia performed a brief "protective sweep" of the bedroom in which the defendant had just been hiding. The defendant was escorted out of the home after Officer Garcia performed this brief search of the bedroom. Officer Garcia then performed a second search of the bedroom.

¶ 16. Officer Garcia testified that while performing this second search, he discovered underneath the defendant's bed the canister that the officers earlier had observed in the defendant's hand. Officer Garcia opened the canister. The canister contained a substance that Officer Garcia identified as cocaine.

¶ 17. Officer Garcia testified that his purpose in performing the second search of the defendant's bedroom was "to search[] for the canister." When asked why he did not obtain a warrant before performing this second search of the defendant's bedroom, Officer Garcia testified that he "didn't think of it."

¶ 18. Officer Anderson's testimony regarding Officer Garcia's searches of the bedroom was inconsistent with Officer Garcia's testimony on one point. Officer Anderson testified that Officer Garcia discovered the canister during his initial search of the defendant's bedroom, not during the second search. Officer Anderson offered no testimony regarding the nature or timing of either the first or second searches of the bedroom.

¶ 19. The circuit court did not make a factual finding regarding whether Officer Garcia discovered the canister and contraband during his first or second search of the defendant's bedroom. In his brief, the defendant states that the canister and contraband were discovered during the second search of the

defendant's bedroom.[8] The State asserts in its reply brief that it is unclear whether the canister was found during the first or second search of the defendant's bedroom.[9]

¶ 20. Subsequent to his arrest, the defendant was transported to the Racine County Jail. The defendant allegedly made inculpatory statements to police while at the jail.

¶ 21. The State charged the defendant with one count of obstructing an officer and one count of second offense possession of cocaine with intent to deliver. The defendant was charged as a habitual offender under each count.

¶ 22. The defendant moved to suppress as evidence the contraband that Officer Garcia discovered while searching the defendant's bedroom, as well as the statements that the defendant allegedly made at the Racine County Jail. The circuit court denied the defendant's suppression motion.

¶ 23. The defendant pled guilty to possession of cocaine with intent to deliver as a second offense and as a habitual offender. The defendant filed a motion for postconviction relief, which the circuit court denied.

¶ 24. The court of appeals reversed the order of the circuit court, holding that the officers' warrantless entry into the defendant's residence was unlawful. The court of appeals did not address the question whether the searches of the defendant's bedroom were lawful.

---

[8] *See* Brief and Appendix of Defendant-Appellant at 5–6.

[9] *See* Reply Brief of [State] Plaintiff-Respondent-Petitioner at 8.

## II

¶ 25. Assuming without deciding that the warrantless entry into the defendant's home was justified under the Fourth Amendment, we consider whether the warrantless search of the defendant's bedroom and the warrantless search of the canister and seizure of the contents thereof are constitutional under the Fourth Amendment. The question whether a search is constitutional is a question of constitutional fact.[10] This court upholds the circuit court's findings of evidentiary or historical facts unless those findings are clearly erroneous. This court determines the application of constitutional principles to those evidentiary facts independently of the circuit court and court of appeals but benefiting from those courts' analyses.[11]

¶ 26. Neither the record nor the circuit court's findings resolves whether the canister was found during the first or second search of the defendant's bedroom. Resolution of this factual question is unnecessary for purposes of this review. We conclude that the search of the canister and seizure of its contents were unlawful regardless of whether the canister was found during the first or second search of the bedroom.

¶ 27. We approach the issue of the search of the bedroom and the search of the canister and seizure of its contents with the understanding that warrantless searches are per se unreasonable under the Fourth Amendment, subject to a few carefully delineated ex-

---

[10] *State v. Kieffer,* 217 Wis. 2d 531, 541, 577 N.W.2d 352 (1998).

[11] *State v. Hughes,* 2000 WI 24, ¶ 15, 233 Wis. 2d 280, 607 N.W.2d 621.

ceptions.[12] We must therefore determine whether the warrantless search of the defendant's bedroom and the search of the canister and seizure of the contents of the canister fall within any of the delineated exceptions. The burden is on the State to show that the search of the bedroom and search of the canister and seizure of its contents fall within one of the exceptions to the warrant requirement. "[T]he general requirement that a search warrant be obtained is not lightly to be dispensed with, and the burden is on those seeking an exemption from the requirement to show the need for it."[13]

A. The First Search

¶ 28. For purposes of this part of the opinion, we assume that Officer Garcia discovered the canister and contraband during his first search of the defendant's bedroom and that the officers' presence in the home was lawful.

¶ 29. The record offers little information regarding what happened during the first search. Officer Garcia's testimony flatly contradicts the very premise that Officer Garcia discovered the canister and contraband during his first search of the bedroom. Officer Anderson offered no testimony describing Officer Garcia's searches.

¶ 30. The State's brief seems to assume that if the first warrantless search of the bedroom falls within an exception to the warrant requirement, the search of the

[12] *State v. Murdock,* 155 Wis. 2d 217, 227, 455 N.W.2d 618 (1990) (citation omitted).

[13] *Chimel v. California,* 395 U.S. 752, 762 (1969) (citation and internal quotation marks and brackets omitted).

canister and seizure of its contents during the first search of the bedroom also fall within an exception to the warrant requirement.

¶ 31. The State relies on the "protective sweep" exception to the search warrant requirement established in *Maryland v. Buie,* 494 U.S. 325 (1990), to validate the search of the bedroom.

■

¶ 32. The protective sweep doctrine applies once law enforcement officers are inside an area, including a home. Once inside an area a law enforcement officer may perform a warrantless "protective sweep," that is, "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."[14] Under *Buie,* a law enforcement officer is justified in performing a warrantless protective sweep when the officer possesses "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others."[15] Because the protective sweep exception authorizes only a limited intrusion, *Buie* requires the officer to have only reasonable suspicion that the area poses a danger to the officer or others; the test is not probable cause.[16]

---

[14] *Maryland v. Buie,* 494 U.S. 325, 327 (1990).

[15] *Id.* (internal quotation marks & citation omitted).

[16] *See id.* at 336 (characterizing a protective sweep as a "limited intrusion," not as a "full-blown search"; requiring "reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene"); *id.* at 334 n.2 ("*Terry* requires reasonable, individualized suspicion before

¶ 33. The protective sweep extends "to a cursory inspection of those spaces where a person may be found"[17] and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."[18]

¶ 34. The State argues that Officer Garcia's initial search of the defendant's bedroom was justified under the *Buie* standard. According to the State, the officer had reasonable suspicion of drug trafficking and therefore understandably feared others may be present who would jeopardize the officers' safety.[19] The State recounts that the defendant "was uncooperative, had fled, was carrying money and a container that looked like it could be used to conceal drugs and, in addition, the area where [the defendant's] apartment is located is noted for drug trafficking."[20]

¶ 35. Accepting for the moment the State's position that articulable facts exist to demonstrate that the officer had reasonable suspicion that other persons may be lurking in the defendant's bedroom who would pose a danger to the officers and that a protective search of the bedroom was therefore justified, we nevertheless must conclude that Officer Garcia's search of the canister and seizure of its contents clearly were not within

a frisk for weapons can be conducted. That approach is applied to the protective sweep of a house.").

[17] *Buie,* 494 U.S. at 335.

[18] *Id.* at 335–36.

[19] Reply Brief of [State] Plaintiff-Respondent-Petitioner at 8.

[20] Brief and Appendix of [State] Plaintiff-Respondent-Petitioner at 33.

the purpose of the protective sweep. The search of the canister and seizure of its contents were not part of a search for persons who might pose a danger to law enforcement officers or to others. No person could be hiding in the canister. Furthermore, the officers had no articulable suspicion that weapons were involved in the instant case. The search of the canister and seizure of its contents therefore do not fall within the "protective sweep" exception to the search warrant requirement.

¶ 36. Accordingly, we determine that if the canister was searched and the contents of the canister were seized during the first search of the defendant's bedroom, the search of the canister and the seizure of its contents do not fall within the protective sweep exception to the search warrant requirement. The physical evidence is therefore the fruit of a search that violated the Fourth Amendment and must be suppressed.

██

¶ 37. The State offers no justification for the officers' search of the canister and seizure of its contents beyond the protective sweep exception to the warrant requirement. Under our case law, warrantless seizure and inspection of evidence are justified when the officer is lawfully in a position to observe the evidence, the evidence is in plain view of the officer, the discovery is inadvertent, and the item seized in itself or in itself with facts known to the officer at the time of the seizure provides probable cause to believe there is a connection between the evidence and criminal activity.[21] The State does not, however, cite to or rely on this

---

[21] *See State v. McGill*, 2000 WI 38, ¶ 40, 234 Wis. 2d 560, 609 N.W.2d 795 ("An officer may inspect an object seized in a *Terry* frisk when it is immediately apparent that the object is, or contains, contraband.").

line of cases and does not argue in this court that Officer Garcia had probable cause to believe that there was a connection between the canister and criminal activity. The State argues in this court only that the officers had reasonable suspicion of a drug offense.[22]

¶ 38. The present case is reminiscent of *Arizona v. Hicks,* 480 U.S. 321, 324–25 (1987), in which officers were lawfully in an apartment looking for a shooter. Suspecting that stereo components in the squalid, ill-appointed apartment might be stolen goods, one of the officers moved some pieces of equipment slightly to reveal and record their serial numbers. The officer called in the serial numbers and immediately established that the equipment was stolen property. The law enforcement officers seized the equipment. The United States Supreme Court held that the officer's initial movement of the equipment was a search separate and apart from the search of the apartment for the shooter that justified the officer's original entry into the apartment and that the search of the equipment was unreasonable under the Fourth Amendment because only reasonable suspicion, not probable cause, existed to believe that the equipment was stolen.

¶ 39. *Hicks* teaches that even in the face of a lawful entry and reasonable suspicion that an object is evidence of a crime, a slight movement of the object is an impermissible search whenever it is "unrelated to the objectives of the authorized intrusion."[23]

---

[22] The State unsuccessfully argued before the court of appeals that the officers had probable cause to believe that Sanders was involved in a drug offense. *Sanders,* 2007 WI App 174, ¶ 1.

[23] *Arizona v. Hicks,* 480 U.S. 321, 325 (1987).

¶ 40. In the instant case the officers were in the home to arrest the defendant for obstructing the officers. The officer did not merely move the canister slightly and examine its exterior surface. Rather, the officer removed the canister from under the bed and opened it.

¶ 41. Because the officer's search of the canister and seizure of the contents were unrelated to the objectives of the authorized intrusion into the bedroom as a protective sweep in relation to arresting the defendant for obstructing the officers, the officer's search of the canister and seizure of its contents do not fall within the protective sweep exception to the warrant requirement.

¶ 42. Accordingly, we conclude that if the canister was searched and its contents were seized during the first search of the defendant's bedroom, the physical evidence in the canister is the fruit of a search that violated the Fourth Amendment and must be suppressed.

B. The Second Search

¶ 43. For purposes of this part of the opinion, we assume that Officer Garcia searched the canister and seized its contents during his second search of the defendant's bedroom and that the officers' presence in the home was lawful.

¶ 44. The record offers little information regarding what happened during the second search of the bedroom. Officer Garcia testified that he discovered the canister and contraband during his second search of the bedroom while he was looking under the bed.

¶ 45. The defendant was arrested in the living room. The parties do not dispute that the police had probable cause to arrest the defendant for obstructing

an officer. The State relies on the "search incident to an arrest" exception to the Fourth Amendment warrant requirement to justify the second search of the bedroom.

¶ 46. The State's brief seems to assume that if the second warrantless search of the bedroom falls within an exception to the warrant requirement, the search of the canister and seizure of its contents during the second search of the bedroom also fall within an exception to the warrant requirement.

¶ 47. The circuit court concluded that the search of the bedroom was a valid search pursuant to an arrest.

¶ 48. The scope of what is conventionally termed the "search incident to arrest" exception to the Fourth Amendment warrant requirement was set forth in *Chimel v. California,* 395 U.S. 752 (1969). In *Chimel,* the United States Supreme Court held that a lawful arrest creates a situation justifying a contemporaneous, warrantless "search of the arrestee's person and the area within his immediate control."[24] It is a search of the area within the arrestee's immediate control that is at issue here.

¶ 49. This exception to the warrant requirement serves two primary governmental interests. "One is the need to detect and remove any weapons that the arrestee might try to use to resist arrest or escape. Another is the need to prevent the destruction or concealment of evidence."[25]

---

[24] *Chimel v. California,* 395 U.S. 752, 763 (1969) (internal quotation marks omitted).

[25] *Murdock,* 155 Wis. 2d at 228 (citing *Chimel,* 395 U.S. at 763).

274

■

¶ 50. Significantly, while "the *Chimel* rule states that it is reasonable to search an area near the arrestee," the rule does not permit a warrantless search of "an area so broad as to be unrelated to the protective purposes of the search."[26] "Thus, *Chimel* defines the area of 'immediate control' within which the police may reasonably search incident to arrest as 'the area from within which [the arrestee] might gain possession of a weapon or destructible evidence.' "[27]

¶ 51. The State contends that Officer Garcia's second search of the defendant's bedroom was justified as a search incident to arrest under the *Chimel* standard because the bedroom was "within [the defendant's] immediate presence or control when he barricaded himself in the bedroom and was out of the police officers' sight."[28]

¶ 52. Although the bedroom might be considered within the defendant's immediate presence or control for *Chimel* purposes, we do not agree with the State that the second search of the bedroom was a search incident to arrest under the circumstances of the present case. The second search occurred after the defendant had been removed from the home.[29] The defendant could not have gained possession of a weapon or destructible evidence from his bedroom when the

[26] *Id.* at 228–29.

[27] *Id.* at 229 (quoting *Chimel*, 395 U.S. at 763).

[28] Brief and Appendix of [State] Plaintiff-Respondent-Petitioner at 36.

[29] In its brief, the State asserts that Officer Garcia's second search of the defendant's bedroom "occurred just after [the defendant] was handcuffed and removed from [his residence]." Brief and Appendix of [State] Plaintiff-Respondent-Petitioner at 36.

defendant was not even inside the home when the bedroom and canister were searched and the contents of the canister seized.

¶ 53. The State relies upon *State v. Murdock,* 155 Wis. 2d 217, 227, 455 N.W.2d 618 (1990), to support the second search of the bedroom under the *Chimel* standard even though the defendant in the instant case had been removed from the home. *Murdock* does not authorize the search of the bedroom at issue in the present case as a search incident to arrest.

¶ 54. In *Murdock,* law enforcement officers performed a warrantless search of an area immediately surrounding the defendant. The search was contemporaneous with handcuffing the defendant.[30] The search involved a pantry-type closet connected to the room in which the arrest was made. The court upheld the search notwithstanding the defendant's restrained condition and apparent inability to access the areas immediately surrounding him. The *Murdock* court was "unwilling to say that a defendant who is arrested in *and remains in* his or her dwelling as the search is conducted could never regain access to areas in his or her immediate control at the time of arrest."[31]

¶ 55. The *Murdock* court also determined that even when an arrestee is handcuffed, "we cannot require an officer to weigh the arrestee's probability of success in obtaining a weapon or destructible evidence

---

Nothing in the record suggests that the defendant was still in his residence at the time that Officer Garcia performed his second search of the defendant's bedroom. The record instead shows that the State was correct to assert in its brief that the second search occurred after the defendant had been handcuffed and removed from his residence.

[30] *Murdock,* 155 Wis. 2d at 223.

[31] *Id.* at 234 (emphasis added).

hidden *within his or her immediate control.*[32] According to the *Murdock* court, *Chimel* authorizes a limited, contemporaneous search for weapons and evidence in the area surrounding the arrestee. "Its sanction of a contemporaneous, limited search protects the individual's privacy interests in areas outside his or her immediate control and also serves valid societal interests in protecting officer safety and preserving evidence."[33]

¶ 56. The facts in the present case do not resemble those in *Murdock*. In the instant case, unlike in *Murdock,* the defendant was not in his home when the bedroom was searched. The defendant had already been removed from the home at the time of the search. No possibility existed that the defendant could obtain a weapon or destroy evidence in the home. The purposes of the search incident to arrest were achieved by removing the defendant from his home. By removing the defendant from the home, the officers eliminated the need to detect and remove any weapons that the arrestee might try to use to resist arrest or escape or to prevent the destruction or concealment of evidence.

¶ 57. Neither *Chimel* nor *Murdock* governs the instant case, in which the defendant was removed from the home before the search supposedly incident to the arrest.

¶ 58. At oral argument, the State suggested that the law enforcement officers were justified in conducting the second warrantless search of the defendant's bedroom because it was "highly likely" that persons other than the defendant would destroy evidence inside the defendant's bedroom had the officers waited to

---

[32] *Id.* at 235 (emphasis added).
[33] *Id.* at 236.

obtain a warrant before searching for the evidence. Nothing in the record supports speculation that other persons posed risks. Nothing in the record suggests that the law enforcement officers could not have maintained the status quo and could not have obtained a search warrant promptly upon a showing of probable cause to believe illicit drugs were in the home.

¶ 59. Accordingly, we determine that the second search of the bedroom does not fall within the search incident to arrest exception to the search warrant requirement. If the canister was searched and the contents seized during the second search of the defendant's bedroom, the search and seizure were not within the State's claimed search incident to arrest exception to the search warrant requirement. The physical evidence in the canister is therefore the fruit of a search that violated the Fourth Amendment and must be suppressed.

\* \* \* \*

¶ 60. For the reasons set forth, we affirm the decision of the court of appeals reversing the circuit court's order denying the defendant's motion to suppress and reversing the circuit court's judgment of conviction.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 61. DAVID T. PROSSER, J. (*concurring*). The court is unanimous that evidence of a yellow and black canister containing cocaine must be suppressed because the canister was obtained in a search without a warrant in violation of the Fourth Amendment. I agree with the

majority opinion's analysis that police searches for that canister and its contents inside the defendant's house were not valid.

¶ 62. I write separately to address the real issue that brought this case before the court: namely, whether warrantless police entry into a home under the exigency of "hot pursuit" to arrest a person for a misdemeanor violates the Fourth Amendment, as stated in *State v. Mikkelson,* 2002 WI App 152, 256 Wis. 2d 132, 647 N.W.2d 421.

¶ 63. The facts are undisputed that the defendant in this case committed a jailable criminal offense in the presence of police and that police entered the defendant's house in hot pursuit to effect the defendant's immediate arrest. Entering a home without a warrant under these circumstances is not unreasonable. Entry into a home in hot pursuit to arrest a person on probable cause for a jailable criminal offense is a longstanding, common sense exception to the warrant requirement. Accordingly, I concur.

## I. BACKGROUND

¶ 64. The facts relevant to the warrantless entry of defendant Dwight Sanders' (Sanders) residence are stated below. They are based on the testimony of Officers Jorge Garcia (Officer Garcia) and Hendriel Anderson (Officer Anderson) at an August 5, 2005, hearing on Sanders' motion to suppress.

¶ 65. On May 6, 2005, Officers Garcia and Anderson were sent to 1222 Villa Street in the City of Racine in response to a complaint of cruelty to animals. Officer Garcia testified that he was familiar with the neighborhood as a high-volume drug trafficking area, although the residence in question was not a known "drug

house." The officers entered the property through an open fence. They heard a dog yelping and made contact with four males standing in the back yard. The officers saw several pit bull dogs, but none of them showed signs of injury or mistreatment.

¶ 66. Officer Garcia observed that one of the men, later identified as Sanders, was holding an unknown amount of folded United States currency and a yellow and black canister in his left hand. Officer Garcia testified that it would not be unusual for persons selling drugs to conceal them in a canister similar to the one Sanders was holding.

¶ 67. Officer Anderson advised Sanders of the animal abuse complaint and requested identification. Sanders responded that he "did not do anything wrong" and that "this [is] bullshit." Sanders repeatedly refused to give his name, address, and date of birth. Officer Anderson testified that he became "firm" with Sanders and attempted to handcuff him for officer safety. Sanders reacted by backing away, turning, and running toward the house. Officer Anderson ordered Sanders to stop, but he did not obey. Sanders ran into the house. Officer Garcia believed he had probable cause to arrest Sanders for obstructing an officer.

¶ 68. The officers immediately chased Sanders into the house where Sanders had barricaded himself in a bedroom. Sanders voluntarily emerged from the bedroom after about one minute and was arrested. Officer Anderson testified that his purpose in chasing Sanders into the house was that he saw Sanders as a threat to himself and Officer Garcia. The officers pursued Sanders into the house to take him into custody, not to search for evidence in his house. After arresting Sanders, however, Officer Garcia searched Sanders' bedroom twice and located the canister that Sanders was holding

while he was in the back yard. Officer Garcia opened the canister and found crack cocaine.[1]

¶ 69. The circuit court denied Sanders' motion to suppress the evidence seized during the searches of Sanders' bedroom. The court of appeals reversed, holding that the officers' warrantless entry into Sanders' residence violated the Fourth Amendment. *State v. Sanders*, 2007 WI App 174, ¶ 33, 304 Wis. 2d 159, 737 N.W.2d 44. It is this latter conclusion—one that the chief judge of the Wisconsin Court of Appeals asked us to review, *id.,* ¶ 35 (Brown, J., concurring)—that requires this separate writing.

## II. ANALYSIS

¶ 70. The issue of hot pursuit is before us because the court of appeals applied its 2002 decision in *Mikkelson* to the facts of this case. *Sanders,* 304 Wis. 2d 159, ¶ 33. Thus, the majority opinion neglects to confront the very issue why this court accepted the State's petition for review.

¶ 71. In *Mikkelson* the court of appeals held that a warrantless entry into a home under the exigency of "hot pursuit" to arrest a probable misdemeanant violates the Fourth Amendment. *Mikkelson,* 256 Wis. 2d 132, ¶ 17. In the case at hand, the court of appeals applied this bright-line rule from *Mikkelson* to suppress the evidence and statements obtained by police after the warrantless entry into Sanders' residence. *Sanders,* 304 Wis. 2d 159, ¶ 33. However, *Welsh v. Wisconsin*, 466 U.S. 740 (1984), does not mandate the decision in *Mikkelson,* and the *Mikkelson* court erred when it concluded that its decision was required by *Welsh.*

---

[1] These searches were not valid for the reasons explained in the majority opinion. *See* majority op., ¶¶ 25–59.

Nonetheless, the majority simply looks away. The *Mikkelson* decision represents a major departure from prior law: e.g., the decisions of the United States Supreme Court, the decisions of the Wisconsin Supreme Court, and the decisions of courts in other states. It creates serious problems for law enforcement officers attempting to preserve order and effect expedient, lawful arrests for crimes that are grounded in probable cause.

¶ 72. Historically, the distinct exigency of hot pursuit has been sufficient to justify the warrantless entry of a dwelling to arrest a person for a misdemeanor such as obstructing an officer. Abandoning this principle creates a perverse incentive for misdemeanor defendants to flee from police officers into their homes to prevent their lawful seizure.

¶ 73. To address these concerns, this concurrence will first discuss the *Mikkelson* decision—which involved some peculiar facts regarding consent—and show that it was an aberration that did not follow either federal or state precedents interpreting and applying *Welsh*. The concurrence will then discuss existing law regarding "hot pursuit" as a stand-alone justification for a warrantless home entry and arrest.

A. The *Mikkelson* Rule

¶ 74. *Mikkelson* involved an encounter between Harold Mikkelson (Mikkelson) and Officer Bonita Jo Johnson (Officer Johnson), a police officer in Superior. *Mikkelson*, 256 Wis. 2d 132, ¶¶ 1–2. While on vehicle patrol, Officer Johnson observed a male, later determined to be Mikkelson, making suspicious movements between a car and garage. *Id.*, ¶ 2. Officer Johnson pulled her squad car into an alley and shined her light

on the scene. *Id.* She saw Mikkelson duck down inside a minivan. *Id.* She approached the van and asked Mikkelson for his name and an explanation for his actions. *Id.*, ¶ 3. Mikkelson responded that he lived there, in an adjacent house, and that he was doing nothing wrong. *Id.* When Officer Johnson asked what he was doing in the van, Mikkelson pushed her away and walked toward the house. *Id.* Officer Johnson ordered Mikkelson to stop, but he kept walking. *Id.* When Officer Johnson reached to grab Mikkelson's arm, he again pushed her away. *Id.* At that point Officer Johnson decided to arrest Mikkelson for obstructing an officer. *Id.*, ¶ 3 n.1. Officer Johnson sprayed Mikkelson with chemical spray, but Mikkelson was able to enter the house while Officer Johnson radioed for backup. *See id.*, ¶ 3.

¶ 75. When help arrived, Officer Johnson knocked on the door, spoke with Mikkelson's father, and was told that Mikkelson would be forthcoming. *Id.*, ¶ 4. However, Mikkelson never appeared. *Id.* According to Officer Johnson, she then received permission from Mikkelson's mother to enter the house. *Id.*, ¶ 5. After gaining entry, several officers went into the basement and arrested Mikkelson. *Id.*, ¶ 6. During the arrest, Mikkelson allegedly punched an officer and was subsequently charged with a misdemeanor count of obstructing an officer and a felony count of battery to a police officer. *Id.*

¶ 76. Mikkelson moved to suppress all evidence obtained by the police inside the house. *Id.*, ¶ 7. At the suppression hearing, three officers testified that they had been given consent to enter Mikkelson's house. *Id.*, ¶ 8. This was disputed by Mikkelson's parents. *Id.*, ¶ 5. The circuit court found that the officers had not received consent to enter the house, and therefore sup-

283

pressed evidence of everything that happened in the house. *Id.*, ¶ 9. The State appealed. *Id.*, ¶ 1. It did not challenge the circuit court's ruling on consent. Instead, it argued that the police had probable cause to pursue Mikkelson into his home without a search warrant to arrest him for obstructing an officer. *Id.*, ¶¶ 1, 11.

¶ 77. The court of appeals ruled that the State had waived its argument that police were entitled to enter Mikkelson's house without a warrant because they were in hot pursuit. *Id.*, ¶¶ 13, 16. Nonetheless, a plainly annoyed court addressed the hot pursuit argument and held that, under the facts presented, the argument was without merit. *Id.*, ¶ 17. The court stated:

> Even if we were to consider the State's argument, we would reject it. An arrest made in hot pursuit constitutes an exigent circumstance required for a warrantless entry. *State v. Smith,* 131 Wis. 2d 220, 229, 388 N.W.2d 601 (1986). Relying on *United States v. Santana,* 427 U.S. 38, 43 (1976), the State argues that the police were entitled to enter the house and arrest Mikkelson because they were in hot pursuit. *Santana* holds that a suspect may not defeat an arrest that has been set in motion in a public place by escaping to a private place. *Id.* However, in *Welsh v. Wisconsin,* 466 U.S. 740, 749–51 (1984), the Supreme Court limited *Santana* to the hot pursuit of fleeing felons. Also, the court in *Payton v. New York,* 445 U.S. 573 (1980), stated that *Santana* was limited to in-home arrests of felons when police have probable cause and exigent circumstances. The police were pursuing Mikkelson for obstructing an officer, a misdemeanor. *See* Wis. Stat. § 946.41. Therefore, *Santana* does not permit the warrantless entry into Mikkelson's house.

*Id.* (footnote omitted).

¶ 78. The *Mikkelson* court's reading of *Welsh* went too far. The *Welsh* Court hailed the sanctity of the home and the importance of the warrant requirement for agents of the government who seek to enter a home for purposes of search or arrest. *Welsh*, 466 U.S. at 748. But the Court also recognized the exception for exigent circumstances, including hot pursuit. *Id.* at 750. The Court did not draw a distinction between felonies and other jailable crimes. Instead, it singled out "a non-criminal, civil forfeiture offense for which no imprisonment is possible," *id.* at 754, as the sort of "minor offense" that would "rarely" justify the exigent circumstances exception. *Id.* at 753.

¶ 79. In *Welsh*, the Court considered whether the Fourth Amendment prohibits the police from making a warrantless night entry into a person's home to arrest him for a nonjailable traffic offense. *See id.* at 742. The defendant, Edward Welsh (Welsh), drove his car while intoxicated, swerved off the road into an open field, left the scene of the accident, and walked home. *Id.* at 742–43. An eyewitness told police of his observations of the accident and his conversations with the intoxicated driver. *Id.* at 742. The police proceeded to the driver's home,[2] entered it without a warrant or consent, found Welsh in bed, and arrested him for driving a motor vehicle while under the influence of an intoxicant. *Id.* at 743. At that time, a first offense for driving while intoxicated in Wisconsin was a noncriminal violation subject to a civil forfeiture of $200. *Id.* at 746.

¶ 80. The Court determined that a warrantless entry under these circumstances violated the Fourth

---

[2] The *Welsh* majority pointedly disqualified the exigency of "hot pursuit" because there "was no immediate or continuous pursuit of the [defendant] from the scene of a crime." *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984).

285

Amendment. *Id.* at 754. The Court considered both the exigency of destruction of evidence (due to Welsh's body metabolizing the alcohol) and the minor nature of the civil, nonjailable offense of first-time drunk driving, and concluded that the police entry and arrest were not reasonable. *Id.* The Court held that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Welsh,* 466 U.S. at 753. In dealing with warrantless entry of a home, the Court stated that an exigency is not created merely because there is probable cause to believe that a serious crime has been committed, and "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." *Id.*

¶ 81. The Court did not state that all misdemeanors are inherently "minor." Instead, the Court cautioned that the critical factor in judging the impact of a particular offense is not the nature of the crime but "the penalty that may attach to any particular offense." *Id.* at 754 n.14.[3] The Court added that the penalty "seems to provide the clearest and most consistent indication of the State's interest in arresting individuals suspected of committing that offense." *Id.*

[3] One commentator has observed that the Court's holding in *Welsh* can be read to distinguish between the "civil" or "criminal" nature of an offense:

> [T]he *Welsh* Court specifically disavowed any judicial judgment about the significance of the actual violation in question and deferred instead to Wisconsin's classification of the offense as "civil" in deciding the case. If Wisconsin were unhappy with the Court's decision, it could, therefore, nullify it prospectively by simply changing (legislatively) the status of driving while intoxicated from a civil violation to a criminal offense.

¶ 82. The Court concluded that there were no exigent circumstances at play in *Welsh* sufficient to justify a warrantless home entry and arrest; therefore, it had "no occasion to consider whether the Fourth Amendment may impose an absolute ban on warrantless home arrests for certain minor offenses." *Id.* at 749 n.11.

¶ 83. The *Mikkelson* court's mistaken reading of *Welsh* is confirmed by the fact that the Supreme Court subsequently explained that *Welsh* drew a distinction between jailable and nonjailable offenses, not between felony and misdemeanor offenses. *Illinois v. McArthur*, 531 U.S. 326, 335–36 (2001). The Court emphasized in *McArthur* that the important factor in determining whether an offense provides a justification supporting an exigent circumstances exception to the warrant requirement is whether the offense is jailable. *Id.* at 336.

¶ 84. *McArthur* involved the question of whether police officers effected an unlawful "seizure" when they prevented the defendant, Charles McArthur (McArthur), from entering his home for two hours while police obtained a search warrant. *Id.* at 329–30. After receiving the warrant, police searched McArthur's home and retrieved marijuana and drug paraphernalia. *Id.* at 329. The Court ruled that, although McArthur was seized, the police action of preventing him from entering his residence did not offend the Fourth Amendment. *Id.* at 333, 337.

¶ 85. The Court addressed the reasonableness of the seizure based on the gravity of the misdemeanor offenses of possession of drug paraphernalia and marijuana. *Id.* at 330, 335–36. McArthur argued that, under

Sherry F. Colb, *The Qualitative Dimension of Fourth Amendment "Reasonableness"*, 98 Colum. L. Rev. 1642, 1683 (1998) (footnotes omitted).

*Welsh,* his misdemeanor offenses were "minor," and therefore would not justify the seizure. *Id.* at 335–36. The Court rejected this distinction and noted that it had held in *Welsh* that "police could not enter a home without a warrant in order to prevent the loss of evidence (namely, the defendant's blood alcohol level) of the 'nonjailable traffic offense' of driving while intoxicated." *Id.* at 335 (quoting and citing *Welsh,* 466 U.S. at 742, 754). The Court further distinguished *Welsh:*

> We nonetheless find significant distinctions. The evidence at issue here was of crimes that were "jailable," not "nonjailable." *See* Ill. Comp. Stat., ch. 720, § 550/4(a) (1998); ch. 730, § 5/5–8–3(3) (possession of less than 2.5 grams of marijuana punishable by up to 30 days in jail); ch. 720, § 600/3.5; ch. 730, § 5/5–8–3(1) (possession of drug paraphernalia punishable by up to one year in jail). In *Welsh,* we noted that, "[g]iven that the classification of state crimes differs widely among the States, the penalty that may attach to any particular offense seems to provide the clearest and most consistent indication of the State's interest in arresting individuals suspected of committing that offense." 466 U.S., at 754, n.14. The same reasoning applies here, where class C misdemeanors include such widely diverse offenses as drag racing, drinking alcohol in a railroad car or on a railroad platform, bribery by a candidate for public office, and assault. *See, e.g.,* Ill. Comp. Stat., ch. 65, § 5/4–8-2 (1998); ch. 610, § 90/1; ch. 625, § 5/11–504; ch. 720, § 5/12–1.

*McArthur,* 531 U.S. at 336.

¶ 86. The highest courts of several states have interpreted *Welsh*—and *McArthur*—and concluded that the important distinction recognized by *Welsh* is the distinction between jailable and nonjailable offenses. For example, the Wyoming Supreme Court has stated that "[t]he unmistakable implication of the discussion

in *McArthur* is that the distinction drawn by the Court in *Welsh* between minor offenses that do not justify a warrantless entry into a residence and those offenses that do is predicated upon whether the subject offense carries a potential jail term." *Rideout v. State,* 122 P.3d 201, 210 (Wyo. 2005).[4]

¶ 87. The Iowa Supreme Court has interpreted *McArthur* similarly and concluded that *Welsh* can be distinguished on the ground that the civil offense at issue was not jailable. *See State v. Legg,* 633 N.W.2d 763, 769–70, 773 (Iowa 2001).

¶ 88. The Minnesota Supreme Court also interpreted *Welsh* and rejected a bright-line rule limiting the availability of the exigency of hot pursuit as a warrant exception to suspected felonies. *State v. Paul,* 548 N.W.2d 260, 267–68 (Minn. 1996). The court concluded that warrantless entry to make a "hot pursuit" arrest for suspected driving under the influence of alcohol (DUI) was lawful because the Minnesota Legislature has determined that DUI is a "serious offense" and "a *criminal* offense for which imprisonment is possible." *Id.* at 267.

¶ 89. Many other state appellate courts have distinguished *Welsh* because the offense at issue there was civil and did not include possible incarceration.[5] These

---

[4] Two recognized criminal law treatises note that the conclusion drawn by the Wyoming Supreme Court in *Rideout v. State,* 122 P.3d 201 (Wyo. 2005), is correct. *See* 2 Wayne R. LaFave, et al., *Criminal Procedure* § 3.6(a), at 243 n.24 (3d ed. 2007); 3 Wayne R. LaFave, *Search and Seizure* § 6.1(f), at 38–39, 39 n.211.2 (4th ed. Supp. 2007).

[5] *See, e.g., People v. Lavoyne M.,* 270 Cal. Rptr. 394, 395–96 (Cal. Ct. App. 1990); *Mendez v. People,* 986 P.2d 275, 283 (Colo. 1999); *Dyer v. State,* 680 So.2d 612, 613 (Fla. Dist. Ct. App. 1996); *Threatt v. State,* 524 S.E.2d 276, 280 (Ga. Ct. App. 1999);

courts have thereby rejected the *Mikkelson* rule that jailable misdemeanor offenses are not sufficient to support a warrantless home entry in hot pursuit of a fleeing suspect. *See Mikkelson,* 256 Wis. 2d 132, ¶ 17. These judicial interpretations of *Welsh* and *McArthur* are consistent with the Supreme Court's signal that the critical factor is not the nature of the offense but "the penalty that may attach to any particular offense." *Welsh,* 466 U.S. at 754 n.14. They also reflect the fact that *Welsh* itself cited two hot pursuit cases involving misdemeanors. *Id.* at 752–53 (citing *State v. Penas,* 263 N.W.2d 835 (Neb. 1978); *State v. Niedermeyer,* 617 P.2d 911 (Or. Ct. App. 1980)).

¶ 90. The jailable/nonjailable distinction noted by the authorities above correlates with this court's discussion of *Welsh* in *State v. Hughes,* 2000 WI 24, 233 Wis. 2d 280, 607 N.W.2d 621, a pre-*McArthur* case. Although *Hughes* involved a warrantless entry premised upon the exigency of potential destruction of evidence (burning marijuana), the court's analysis of *Welsh* is apt. *Id.,* ¶¶ 30–31, 39.

¶ 91. This court correctly anticipated *McArthur* when it noted that the *Welsh* Court "did *not* definitively say . . . that certain categories of offenses are per se insufficiently grave to justify a warrantless entry, only that the minor, noncriminal, *nonjailable* traffic violation in that case (first offense drunk driving) was so." *Id.,* ¶ 30 (second emphasis added). This court evaluated the overall penalty structure for marijuana-related

*City of Kirksville v. Guffey,* 740 S.W.2d 227, 228–29 (Mo. Ct. App. 1987); *State v. Nikola,* 821 A.2d 110, 117–18 (N.J. Super. Ct. App. Div. 2003); *People v. Odenweller,* 527 N.Y.S.2d 127, 129–30 (N.Y. App. Div. 1988); *Beaver v. State,* 106 S.W.3d 243, 248–49 (Tex. Crim. App. 2003); *Cherry v. Commonwealth,* 605 S.E.2d 297, 306–07 (Va. Ct. App. 2004).

offenses while expressly noting that first-time marijuana offenses were misdemeanors subject to punishment of up to six months of incarceration. *Id.*, ¶¶ 36–37. The court determined that even a first-offense marijuana possession was treated "significantly more seriously than the noncriminal, *nonjailable* first offense drunk driving violation involved in *Welsh.*" *Id.*, ¶ 39 (emphasis added).

¶ 92. The Wisconsin Legislature has determined that *all* misdemeanors, regardless of class, are "serious" offenses because *all misdemeanors are jailable offenses.* Wis. Stat. § 939.51. The legislature could have created a class of "minor" or "petty" misdemeanors for which incarceration is not an available punishment.[6] It has not done so. Thus, every misdemeanor is serious in the

---

[6] Several states have classes of misdemeanor offenses not subject to potential imprisonment. Some examples:

- Minnesota has a class of offenses designated "petty" misdemeanors. " 'Petty misdemeanor' means a petty offense which is prohibited by statute, which does not constitute a crime and for which a sentence of a fine of not more than $300 may be imposed." Minn. Stat. § 609.02, Subd. 4a (2007).

- Nebraska's "Class IV" and "Class V" misdemeanors are non-jailable and subject only to maximum fines of $500 and $100, respectively. Neb. Rev. Stat. § 28–106(1) (2007).

- New Hampshire classifies offenses as "felony," "misdemeanor," or "violation." N.H. Rev. Stat. Ann. § 625:9, II (2008). Only a "felony" and "misdemeanor" are considered crimes. *Id.* "A class B misdemeanor is any crime . . . for which the maximum penalty does not include any term of imprisonment." N.H. Rev. Stat. Ann. § 625:9, IV(b) (2008).

- Ohio has a class of "minor misdemeanors" for which punishment cannot exceed a $150 fine, community service, or a financial sanction not constituting a fine. Ohio Rev. Code Ann. § 2901.02(A), (G) (West 2006).

sense that it entails a potential deprivation of liberty. *See, e.g., Paul,* 548 N.W.2d at 267 ("The legislature ... has clearly and consistently indicated that driving under the influence of alcohol is a *serious* offense. The statute under which [the defendant] was charged ... is classified as a *criminal* offense for which imprisonment is possible." (First emphasis added.)). Instead of requiring officers to distinguish felonies from misdemeanors in the midst of hot pursuit, this court should reduce confusion for law enforcement by maintaining the rule that all criminal offenses (felonies and misdemeanors) support the exigency of hot pursuit.[7] Such a rule faithfully reflects the legislature's classification of both felonies and misdemeanors as "jailable" and therefore "serious."

¶ 93. A felony-only rule for hot pursuit allows the perpetrator of a serious misdemeanor offense, for which jail time is a penalty, to avoid immediate arrest merely because of the label ("felony" or "misdemeanor") chosen by the legislature. *See id.*[8] This fortuity is very difficult to defend.

- Texas' "Class C" misdemeanors are subject to no imprisonment and a fine "not to exceed $500." Tex. Penal Code Ann. § 12.23 (Vernon 2003).

- Virginia's "Class 3" and "Class 4" misdemeanors are nonjailable and subject only to maximum fines of $500 and $250, respectively. Va. Code Ann. § 18.2–11(c)-(d) (2004).

[7] Asking law enforcement officers to draw a line between criminal offenses and civil offenses is one thing; asking them to remember whether an offense is categorized as a felony or a misdemeanor, or to assess whether an offense will be charged as a felony or a misdemeanor based on incomplete evidence, is quite another. The impracticality of the distinction is obvious.

[8] The Minnesota Supreme Court also questioned the idea that a bright line felony-only rule would aid law enforcement. *State v. Paul,* 548 N.W.2d 260, 268 (Minn. 1996). The court stated:

¶ 94. The continuing validity of *Mikkelson* fosters such injustice. *Mikkelson* is plainly inconsistent with *McArthur.* The United States Supreme Court has never held that a misdemeanor offense cannot provide justification for a warrantless home entry and arrest in hot pursuit. *Mikkelson* establishes such a per se rule and should be overruled.

## B. Hot Pursuit

¶ 95. This court's decisions in *State v. Smith,* 131 Wis. 2d 220, 229, 388 N.W.2d 601 (1986), and *State v. Richter,* 2000 WI 58, ¶ 29, 235 Wis. 2d 524, 612 N.W.2d 29, identified hot pursuit of a suspect as one of four recognized exigent circumstances authorizing a warrantless home entry and arrest.

¶ 96. Before setting forth the exigent circumstances standards laid out in *Smith* and *Richter,* it is helpful to put these cases in historical context with other Wisconsin and United States Supreme Court decisions recognizing the limited right of police to enter a home without a warrant to arrest a suspect when police have probable cause.

¶ 97. *Agnello v. United States,* 269 U.S. 20 (1925), illustrates an example of a crime committed in the

The determination of whether an offense is a felony or a serious misdemeanor is not one that we should force officers to make on the spot in the tense and often dangerous circumstances of hot pursuit. *See Payton* [*v. New York*], 445 U.S. [573, 619 (1980)] (White, J., dissenting). Adopting a bright-line rule based on the legislature's classification of conduct as a misdemeanor would also sweep away any possibility that warrantless home arrests would be justified for those misdemeanors in which the underlying conduct is serious, or when the underlying offense is minor, but subsequent activity by the perpetrator during his flight from the police elevates the situation to a serious one.

*Paul,* 548 N.W.2d at 268.

293

home and viewed by police outside. *Agnello* involved the question whether the search and seizure of evidence in defendant Frank Agnello's house violated the Fourth Amendment. *Id.* at 30. Two informants were employed by government revenue agents to go to the home of defendant Stephen Alba at 138 Union Street, Brooklyn, New York, to arrange a narcotics purchase from Alba and defendant Antonio Centorino. *Id.* at 28. At a preliminary visit to Alba's house, the informants had received samples of cocaine and scheduled a purchase for the next week. *Id.* When the pair returned to Alba's house at the agreed time, they were accompanied by six revenue agents and a city policeman who remained discreetly outside. *Id.*

¶ 98. During the operation, Alba left his house and returned with Centorino. *Id.* Neither man produced any narcotics for the informants. *Id.* After the informants refused to go to Centorino's house at 172 Columbia Street, Centorino went there alone to fetch drugs. *Id.* He was followed by some of the agents. *Id.* Centorino then went to 167 Columbia Street, a building that was part grocery store—owned by defendant Thomas Pace and defendant Thomas Agnello—and part house—owned by defendant Frank Agnello and Pace. *Id.*

¶ 99. In a short time, Centorino, Pace, and the Agnellos came out of 167 Columbia Street and went back to Alba's house. *Id.* Looking through the windows, the agents on watch saw Frank Agnello produce a number of small packages for delivery to one of the informants and saw an informant hand money over to Alba. *Id.* at 28–29. Upon viewing this transaction, agents rushed into Alba's house, arrested all the defendants, and found and seized packages containing cocaine on the table where the transaction took place. *Id.*

at 29. Agents then went to 167 Columbia Street, entered, and searched the premises without a warrant. *Id.* They found and seized a can of cocaine in Frank Agnello's bedroom, and this evidence was subsequently used at trial as evidence against the defendants. *Id.* at 29–30.

¶ 100. The Court concluded that the warrantless search and seizure of evidence from Frank Agnello's house violated the Fourth Amendment because these actions were not incident to the earlier arrests. *Id.* at 31 (citing *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 391 (1920); *People v. Conway,* 195 N.W. 679 (Mich. 1923); *Gamble v. Keyes,* 153 N.W. 888 (S.D. 1915)). The search of Agnello's house was attenuated in both time and place from the earlier arrests, as Frank Agnello's house was several blocks from Alba's house. *Agnello,* 269 U.S. at 30–31. Significantly, the Court noted no constitutional problem with the warrantless police entry of Alba's house and the arrest of the defendants in that house after agents witnessed the drug transaction through the windows. *Id.* at 30. The Court stated:

> The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted. *See Carroll v. United States,* 267 U.S. 132, 158 (1925); *Weeks v. United States,* 232 U.S. 383, 392 (1914). *The legality of the arrests or of the searches and seizures made at the home of Alba is not questioned. Such* searches and *seizures naturally and usually appertain to and attend such arrests.*

*Agnello,* 269 U.S. at 30 (emphasis added).

¶ 101. Although *Agnello* focused primarily on the legality of the search of the Agnello home and the subsequent seizure of evidence found inside, the Court's endorsement of the warrantless arrest of several suspects in the Alba home after viewing a drug transaction through the windows illustrates the principle that a warrantless arrest can be effectuated in a home when a crime is witnessed by officers outside and an arrest is subsequently, and immediately, pursued inside.

¶ 102. The Court first used the term "hot pursuit" to describe exigent circumstances that might justify a warrantless home entry and arrest in *Johnson v. United States,* 333 U.S. 10 (1948). *Johnson* involved the warrantless entry and search of a hotel room by an officer after the smell of burning opium emanating from within was discovered and reported by a police informant. *Id.* at 12. Police arrived outside the defendant's room, knocked on her door, and the defendant opened it. *Id.* The smell of burning opium was immediately apparent to the officers when they reached the door, and the defendant was arrested and her room searched. *Id.* The search revealed opium and a smoking apparatus, the latter being warm, apparently from recent use. *Id.* The defendant sought to have the evidence suppressed. *Id.*

¶ 103. The Court noted that "[t]here are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with." *Id.* at 14–15. However, the Court held in favor of the defendant, concluding that no such exigency was present. *Id.* at 15. The Court distinguished Johnson's situation by listing circumstances not present that would have otherwise justified a warrantless entry: "No suspect was fleeing or

likely to take flight. The search was of permanent premises, not of a movable vehicle. No evidence or contraband was threatened with removal or destruction, except perhaps the fumes which we suppose in time would disappear." *Id.*

¶ 104. The Government argued that the warrantless entry and arrest did not violate the Fourth Amendment because the arrest was made in "hot pursuit." *Id.* at 16 n.7. The Court said that there was "no element of 'hot pursuit' in the arrest of one who was not in flight, was completely surrounded by agents before she knew of their presence, who claims without denial that she was in bed at the time, and who made no attempt to escape." *Id.*

¶ 105. Nineteen years after *Johnson,* the Court expanded upon this discussion in a seminal decision concerning the exigent circumstances doctrine.[9] In *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294 (1967), police officers had probable cause to believe that an armed robber had entered a particular house. *Id.* at 297. Within minutes of receiving a dispatch, an unspecified number of officers arrived outside the house. *Id.* One of the officers knocked and announced their presence, a woman answered the door, and police told her they believed that a robber had entered the house. *Id.*

---

[9] In *United States v. Santana,* 427 U.S. 38 (1976), the Court observed that "*Warden* was based upon the 'exigencies of the situation,' and did not use the term 'hot pursuit.' " *Id.* at 43 n.3 (citation omitted). Although the *Warden* majority did not use the term "hot pursuit," the concurring opinion of Justice Abe Fortas and the dissenting opinion of Justice William Douglas both used the term. *Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 310, 321 (1967) (Fortas, J., concurring) (Douglas, J., dissenting). For excerpts from these opinions, see the Appendix attached hereto.

Police asked to search the house, and the woman did not object. *Id.* Officers entered and spread out looking for the suspect. *Id.* at 298. Defendant Hayden was discovered in a bedroom, feigning sleep, and was arrested. *Id.* At the same time, officers in other parts of the house came upon and seized items that were related to the robbery. *Id.*

¶ 106. The Court held that neither the warrantless entry of the house, nor the subsequent warrantless search for the suspected robber, offended any constitutional principle. *Id.* Under the circumstances presented, " 'the exigencies of the situation made that course imperative.' " *Id.* (quoting *McDonald v. United States,* 335 U.S. 451, 456 (1948)). Police "acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them." *Warden,* 387 U.S. at 298. The Court held that "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Id.* at 298–99. The Court concluded that "[s]peed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." *Id.* at 299.

¶ 107. Nine years after *Warden,* the Court addressed the "hot pursuit" exigency doctrine in *United States v. Santana,* 427 U.S. 38 (1976). In *Santana,* a controlled drug purchase was arranged in which an associate of defendant Santana was dropped off by an undercover police officer at Santana's residence to obtain heroin. *Id.* at 39–40. The associate, who did not realize she was involved in a police operation, went

inside with marked currency to get drugs, returned to the officer's car, gave heroin to the officer, and was arrested. *Id.* at 40. The associate then told the officer that Santana had retained the marked currency. *Id.*

¶ 108. Police officers proceeded to Santana's house and saw her standing in the front door holding a brown paper bag. *Id.* The officers pulled their van within 15 feet of Santana, shouted "police," and displayed their identification. *Id.* Santana retreated into the vestibule of her home, police followed, and Santana was arrested. *Id.* Police seized both the bag Santana was holding, which contained heroin, and some of the marked currency Santana possessed. *Id.* at 40–41. Santana was charged with possession of heroin with intent to distribute, a felony, and she moved to suppress the heroin and money found after her arrest on the ground that police acted without a warrant. *Id.* at 41.

¶ 109. The Court held that the arrest did not violate the Fourth Amendment and concluded that Santana's act of retreating into her home could not thwart an otherwise proper arrest based on probable cause. *Id.* at 42. The Court noted that Santana was in a "public" place for Fourth Amendment purposes when she was spotted by police while standing at her doorstep and that she subsequently retreated into a "private" place. *Id.* (citation omitted). The Court cited *Warden* and concluded that Santana's case involved a true "hot pursuit" sufficient to justify a warrantless entry. *Id.* at 42–43. The Court noted that " 'hot pursuit' means some sort of a chase, but it need not be an extended hue and cry in and about [the] public streets." *Id.* at 43 (internal quotation marks omitted). The fact that the pursuit ended almost as soon as it began did not render it any the less a "hot pursuit" sufficient to justify the warrantless entry into Santana's house. *Id.* at 43. The Court

concluded that "a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." *Id.* at 43.

¶ 110. Wisconsin has consistently recognized the exigent circumstances principles established by the United States Supreme Court, particularly those related to "hot pursuit." For example, in *West v. State,* 74 Wis. 2d 390, 246 N.W.2d 675 (1976), this court was presented with facts substantially similar to those in *Warden* and concluded that the warrantless police entry of a home to apprehend suspected robbers, who had entered the home only minutes before, was not unreasonable. *Id.* at 400. The court relied heavily upon *Warden* to conclude that "the exigencies of the situation made the course which was taken imperative." *Id.* at 399 (citing *Warden,* 387 U.S. at 298, 299).

¶ 111. In *State v. Monahan,* 76 Wis. 2d 387, 396, 396 n.7, 251 N.W.2d 421 (1977), this court again cited *Warden* as authority for the proposition that "hot pursuit" presents a circumstance "which may justify an exception to the warrant requirement."

¶ 112. In *Laasch v. State,* 84 Wis. 2d 587, 267 N.W.2d 278 (1978), this court considered the case of Karyn Laasch (Laasch), who was arrested and jailed for selling cocaine to a police informer, released two days later, and then arrested in her apartment, without a warrant, 13 days after the first arrest. *Id.* at 588–89. Laasch argued that the second arrest constituted an unreasonable seizure prohibited by the Fourth Amendment and Article I, Section 11 of the Wisconsin Constitution. *Id.* at 591. This court agreed and concluded that, despite probable cause, "the arrest was tainted by the warrantless entry of the defendant's home." *Id.* at 592. The court noted that the state identified no exigent

circumstances necessitating a warrantless entry, and said the record was bereft of such circumstances:

> The arrest was not made in "hot pursuit"; there was no threat to the safety of other persons; there was no risk . that evidence would be destroyed, since the delivered substance had been seized at the time of the previous arrest; and any suggestion that the police feared the defendant would flee is dispelled by the fact that she had been released for approximately two weeks.

*Id.* The court recognized that warrantless in-house arrests had previously been upheld by the Wisconsin Supreme Court and United States Supreme Court on the grounds of consent or exigent circumstances. *Id.* at 593–94 (citing *Johnson v. State,* 75 Wis. 2d 344, 351, 352, 249 N.W.2d 593 (1976); *West,* 74 Wis. 2d 390; *Rinehart v. State,* 63 Wis. 2d 760, 218 N.W.2d 323 (1974)). The court also approvingly cited *Santana* and *Warden* as examples of cases where a warrantless home entry and arrest was upheld because of the existence of exigent circumstances. *Id.* at 595–96.

¶ 113. In *Smith,* the court built upon *Laasch* and the federal rule of exigent circumstances and set forth a list of factors and an objective test to evaluate the justifications for a warrantless home entry by police. *Smith,* 131 Wis. 2d at 229 (citing *Laasch,* 84 Wis. 2d at 595–96; *Steagald v. United States,* 451 U.S. 204, 211–12 (1981)). The *Smith* court identified four categories of circumstances that, when measured against the time needed to obtain a warrant, would constitute the exigent circumstances required for a warrantless entry: "(1) An arrest made in 'hot pursuit,' (2) a threat to safety of a suspect or others, (3) a risk that evidence would be destroyed, and (4) a likelihood that the suspect would flee." *Smith,* 131 Wis. 2d at 229 (citing *Laasch,* 84 Wis. 2d at 592). The court concluded that

whether the circumstances of a warrantless entry were justified should be measured by an objective test, namely: "[w]hether a police officer under the circumstances known to the officer at the time reasonably believes that delay in procuring a warrant would gravely endanger life or risk destruction of evidence or greatly enhance the likelihood of the suspect's escape." *Smith,* 131 Wis. 2d at 230.

¶ 114. The *Smith* court's reliance on the Supreme Court's *Steagald* decision is telling. In *Steagald,* the Court stated that "a warrantless entry of a home would be justified if the police were in 'hot pursuit' of a fugitive." *Steagald,* 451 U.S. at 221 (citing *Santana,* 427 U.S. at 42–43; *Warden,* 387 U.S. 294 (1967)).[10] A "fugitive" has been defined as "[o]ne who flees; used in criminal law with the implication of a flight, evasion, or escape from arrest, prosecution, or imprisonment." *Black's Law Dictionary* 604 (5th ed. 1979). The word "fugitive" is broad enough to cover both felons and misdemeanants.

¶ 115. Fourteen years after *Smith,* in *Richter* this court reviewed a case involving a warrantless home entry by a police officer based on his knowledge of an alleged recent break-in across the street. *Richter,* 235 Wis. 2d 524, ¶ 1. The circumstances of the case were summarized by the court as follows:

[A] Marinette County sheriff's deputy responded to an early-morning dispatch of a burglary in progress at a

---

[10] Recently, in *Brigham City v. Stuart,* 547 U.S. 398 (2006), the Court reiterated that "hot pursuit" can constitute a sufficient exigency for law enforcement to make a warrantless entry. The Court stated: "We have held, for example, that law enforcement officers may make a warrantless entry onto private property . . . to engage in 'hot pursuit' of a fleeing suspect." *Id.* at 403 (citing *Santana,* 427 U.S. at 42–43).

> trailer park. The victim flagged down the deputy as he arrived on the scene and told him that someone had broken into her mobile home, and that she had seen the intruder flee her trailer and enter the defendant's trailer across the street. The deputy observed signs of forced entry at the defendant's trailer—a window screen was knocked out and lying on the ground. The deputy shined his flashlight in the open window and attracted the attention of two people who were sleeping on the floor. They opened the door and identified the defendant, who was sleeping on the couch, as the owner of the trailer. The deputy entered the trailer, woke the defendant, told him what had happened and asked his permission to search the trailer for the burglary suspect. Permission was granted. During the search, the deputy observed marijuana in plain view, which the defendant admitted was his.

*Id.* The defendant was charged with marijuana possession and sought to suppress the physical evidence and statements obtained by police, alleging an illegal entry. *Id.*, ¶ 2. This court concluded that the entry was "justified by exigent circumstances—*specifically, the deputy's 'hot pursuit' of the burglary suspect* and his need to protect the safety of those inside the trailer." *Id.* (emphasis added).

¶ 116. The court evaluated the circumstances and concluded that the officer's entry was "justified by the exigent circumstance of hot pursuit." *Id.*, ¶ 36. The court noted that a warrantless search of a home is presumptively unreasonable under the Fourth Amendment. *Id.*, ¶ 28 (citing *Payton v. New York,* 445 U.S. 573 (1980)). However, the court held that "the Fourth Amendment is not an absolute bar to warrantless, nonconsensual entries into private residences." *Richter,* 235 Wis. 2d 524, ¶ 28. The court stated that there "are four *well-recognized* categories of exigent circum-

stances that have been held to authorize a law enforcement officer's warrantless entry into a home." *Id.*, ¶ 29 (emphasis added). These include: "1) hot pursuit of a suspect, 2) a threat to the safety of a suspect or others, 3) a risk that evidence will be destroyed, and 4) a likelihood that the suspect will flee." *Id.*, ¶ 29 (citing *Smith,* 131 Wis. 2d at 229). The court then stated the objective test to determine whether there are exigent circumstances supporting a warrantless entry: "[w]hether a police officer under the circumstances known to the officer at the time [of entry] reasonably believes that delay in procuring a warrant would gravely endanger life or risk destruction of evidence or greatly enhance the likelihood of the suspect's escape." *Id.*, ¶ 30 (quoting *Smith,* 131 Wis. 2d at 230).

¶ 117. An officer in "hot pursuit" does not need to make a split-second determination about the availability of "hot pursuit" as an exigency justifying a warrantless entry. The officer has to make a determination whether there is probable cause to make an arrest for a jailable crime. Presuming probable cause, pursuit of the suspect is justified. As long as the officer has probable cause to arrest for a jailable criminal offense, the only remaining important question is whether a chase or pursuit satisfies the hot pursuit definition in *Welsh*— "immediate or continuous pursuit of the [defendant] from the scene of a crime." *Welsh,* 466 U.S. at 753. Whether the officer reasonably believes he was in "hot pursuit" is not necessary. Thus, it is hardly surprising that this exigency is not part of the objective test set forth in *Smith* and *Richter.*

¶ 118. There is no implication in our case law that "hot pursuit" cannot stand alone as an exigent circumstance justifying a warrantless home entry and arrest. On the contrary, our cases explicitly recognize that hot

pursuit is a sufficient justification for a warrantless entry and arrest. *Smith,* 131 Wis. 2d at 229; *Richter,* 235 Wis. 2d 524, ¶ 29.

¶ 119. Wisconsin is not alone in this view. Several jurisdictions have recognized that hot pursuit is a sufficient exigency to support a warrantless entry and arrest. The Supreme Court of Ohio held in *City of Middletown v. Flinchum,* 765 N.E.2d 330 (Ohio 2002), that police may pursue a suspect into his home in hot pursuit regardless of whether the offense for which the suspect is being arrested is a felony or a misdemeanor, even though no other exigency is involved. *Id.* at 332.

¶ 120. In *Flinchum,* officers saw the defendant's car waiting at a red traffic light. *Id.* at 331. When the light turned green, the defendant spun his tires. *Id.* Officers followed the defendant and observed him stop his car, then accelerate rapidly, causing his car to fishtail. *Id.* The officers attempted to approach the defendant's car twice, but each time the defendant fled from the police. *Id.*

¶ 121. The officers eventually caught up with the defendant and saw him standing outside his parked car. *Id.* When the defendant saw the officers' cruiser, he ran toward the rear entrance of his home. *Id.* One of the officers pursued the defendant, yelling "stop" and "police" several times, to no avail. *Id.* As the pursuit continued, an officer heard a rear screen door slam at the defendant's house. *Id.* The officer then observed the defendant standing in his kitchen approximately five feet inside his house. *Id.* Without the defendant's consent, the officer entered the house and arrested the defendant, who was subsequently charged with reckless operation, driving under the influence of alcohol, and resisting arrest, all misdemeanors. *Id.* at 331.

¶ 122. The Supreme Court of Ohio held that the warrantless entry and arrest of the defendant was justified by the exigency of hot pursuit alone. *Id.* at 332. The court declared that "a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." *Id.* (quoting *Santana,* 427 U.S. at 43). The court noted that *Santana* involved a felony offense, but saw "no reason to differentiate [defendant's] offense and give him a free pass merely because he was not charged with a more serious crime." *Flinchum,* 765 N.W.2d at 332. Consequently, the court held that "when officers, having identified themselves, are in hot pursuit of a suspect who flees to a house in order to avoid arrest, the police may enter without a warrant, regardless of whether the offense for which the suspect is being arrested is a misdemeanor." *Id.*

¶ 123. In *State v. Paul* the Minnesota Supreme Court declined to adopt a bright-line rule that would prohibit officers from entering a suspected misdemeanant's home when officers are in hot pursuit. *Paul,* 548 N.W.2d at 268. *Paul* involved a defendant charged with the misdemeanor offense of driving under the influence of alcohol. *Id.* at 262. Joseph Gunderson (Gunderson), a uniformed and on-duty police officer, bumped into defendant Peter Dean Paul (Paul) at an auto parts store, spoke with Paul, and noted a strong smell of alcohol on Paul's breath, his slurred speech, flushed face, watery eyes, and difficulty in standing. *Id.* Gunderson then observed Paul leave the store, climb into a pickup truck, drive away, and roll through a stop sign. *Id.* Gunderson followed Paul in his squad car, observed Paul "fishtail" as he entered the highway, and attempted to pull Paul over by activating his squad car's red lights. *Id.*

¶ 124. Paul did not stop but continued on in spite of Gunderson's flashing lights. *Id.* Paul pulled into his driveway, exited the truck, ignored Gunderson's commands to stop and get back in the truck, and "hastily" entered and locked his garage with Gunderson giving chase. *Id.* at 262–63. Gunderson made a warrantless entry into Paul's home and arrested him for DUI. *Id.* at 263. Paul moved to have all evidence obtained pursuant to the arrest suppressed because the entry allegedly violated Paul's Fourth Amendment rights. *Id.*

¶ 125. The Minnesota Supreme Court held that Gunderson's warrantless entry into Paul's home was not unlawful. *Id.* at 268. The court first concluded that Gunderson had probable cause to arrest Paul for DUI. *Id.* at 264. The court then addressed whether Gunderson was in "hot pursuit" of Paul when he made the home entry and arrest. *Id.* The court discussed *Santana* and noted that "a suspect may not defeat an arrest which has been set in motion in a public place by the expedient of retreating to a private place." *Id.* (citing *Santana,* 427 U.S. at 43). The court held that the doctrine of hot pursuit "applies whether police officers engage in a high-speed chase of the suspect . . . or merely approach a suspect who immediately retreats into a house." *Id.* at 265 (footnote omitted). *Paul* fell somewhere in the middle of this continuum. *Id.*

¶ 126. The *Paul* court next analyzed *Welsh* and concluded that it was distinguishable. *Id.* at 266. *Paul* involved both "hot pursuit" of a suspect and the exigency of potential destruction of blood-alcohol evidence. *Id.* The court also found it important that the Minnesota Legislature had "clearly and consistently indicated that driving under the influence of alcohol is a serious offense" due to it being classified "as a *criminal* offense for which imprisonment is possible." *Id.* at 267.

¶ 127. The court rejected Paul's invitation to establish a bright-line rule prohibiting the warrantless entry of a home in hot pursuit when the underlying offense is less than a felony. *Id.* at 267–68. "A bright-line felony rule would allow the perpetrator of certain serious misdemeanor offenses to avoid punishment merely because of how the legislature had [labeled] an infraction." *Id.* at 267. The court also noted that a bright-line rule prohibiting hot pursuit in these circumstances would signal to the misdemeanant that a "hot pursuit or an arrest set in motion can be thwarted by beating the police to one's door." *Id.* at 268. The court's summation of the hot pursuit issue bears repeating:

> The Fourth Amendment simply cannot be stretched nor can public safety be ensured by a bright-line felony rule which would encourage drunk drivers to elude the police by racing through the streets to the sanctuary of their homes in order to "freeze" a hot pursuit or to otherwise evade a lawful arrest.

*Id.*

¶ 128. Two decisions from the Iowa Supreme Court essentially echo the conclusions reached in *Paul* regarding hot pursuit as an exigency sufficient to support a warrantless home entry and arrest for a misdemeanor.

¶ 129. In *State v. Legg* the Iowa Supreme Court upheld a warrantless "hot pursuit" home entry by police who possessed probable cause to believe a suspect had committed the "serious misdemeanors" of interference with official acts and first offense operating while intoxicated. *Legg,* 633 N.W.2d at 766, 772. The court reviewed *Santana, Welsh,* and *McArthur* and concluded that, on balance, the competing privacy and law enforcement concerns weighed in favor of allowing the

minimal intrusion at issue. *Id.* at 769–73. The court noted that "[s]ociety has an interest in not rewarding the evasion of lawful police authority by allowing suspects who make it to their homes steps ahead of law enforcement officers to claim sanctuary." *Id.* at 772 (citation omitted). Like *Santana,* the circumstances of *Legg* involved "(1) the 'realistic expectation ... that any delay would result in destruction of evidence'; and (2) the undesirable consequences of allowing a person to thwart an otherwise proper arrest 'by the expedient of escaping to a private place.'" *Id.* at 773 (quoting and citing *Santana,* 427 U.S. at 43).

¶ 130. Following *Legg,* the Iowa Supreme Court reiterated its position that hot pursuit of a fleeing misdemeanant can provide a justification for a warrantless entry and arrest in *State v. Pink,* 648 N.W.2d 107, 109 (Iowa 2002) (per curiam).

¶ 131. Recently, the Illinois Appellate Court, Fourth District refused to adopt a rule that hot pursuit, standing alone, was insufficient to justify an exception to the warrant requirement. *People v. Wear,* 867 N.E.2d 1027, 1045–46 (Ill. App. Ct. 2007). The officer in *Wear* had probable cause to believe that the defendant committed several traffic violations and was guilty of eluding or attempting to flee an officer, a misdemeanor punishable by up to 364 days in jail. *Id.* at 1041, 1044. The Illinois court discussed *Welsh* and distinguished the case on the grounds that the penalties for the offenses in question were jailable and that the officer in *Wear* was in "hot pursuit." *Id.* at 1044. The court held that the officer "was in hot pursuit of defendant and, *for that reason alone,* had the right to enter the house and arrest him." *Id.* (emphasis added). The court stated that "[i]t appears that the majority of jurisdictions that have considered this question would so hold." *Id.* (citing D.

Gilsinger, *Annotation, When Is Warrantless Entry of House or Other Building Justified Under "Hot Pursuit" Doctrine,* 17 A.L.R.6th 327, §§ 12, 14 (2006)). The Illinois court also noted that the hot pursuit exigency, as a stand-alone warrant exception, has deep roots in the seventeenth and eighteenth century common law. *Id.* at 1045 (citing *Payton v. New York,* 445 U.S. 573, 598 (1980)).[11]

¶ 132. Courts from several other jurisdictions are in accord with these cases from Ohio, Minnesota, Iowa, and Illinois.[12]

---

[11] *Payton v. New York,* 445 U.S. 573, 595 n.41 (1980), included a quotation from 2 M. Hale, *Pleas of the Crown* 92 (1736) that shines some light on the historical roots of "hot pursuit": "if the supposed offender fly and take house, and the door will not be opened upon demand of the constable and notification of his business, the constable may break the door, tho he have no warrant."

[12] *See, e.g., People v. Lloyd,* 265 Cal. Rptr. 422, 424–25 (Cal. Ct. App. 1989)(holding that "hot pursuit" was a "proper exception" to the warrant requirement when an officer made an arrest in the suspect's home for obstruction and traffic violations committed in the officer's presence); *State v. Nichols,* 484 S.E.2d 507, 508–09 (Ga. Ct. App. 1997)(holding that an officer who was in "hot pursuit" of a defendant whom the officer observed committing the misdemeanor of illegal backing was justified in following the defendant into his residence to make a warrantless arrest); *State v. Blake,* 468 N.E.2d 548, 553 (Ind. Ct. App. 1984)(holding that "where there is immediate or continuous pursuit from the scene of a misdemeanor crime to the door of the defendant's home a warrantless home arrest is permitted"); *State v. Brown,* 733 So.2d 1282, 1287–88 (La. Ct. App. 1999)(holding that officers were justified in effectuating a warrantless home entry and arrest for the offense of driving without a license); *LaHaye v. State,* 1 S.W.3d 149, 152–53 (Tex. Crim. App. 1999)(holding that the misdemeanor crime of evading arrest was a serious enough crime that officers in hot pursuit could enter a residence without a warrant to arrest an offender).

¶ 133. These jurisdictions represent a common sense approach to the "hot pursuit" doctrine that avoids creating an incentive for misdemeanant suspects to flee to the home to escape lawful arrest. The home should not be viewed as a "sanctuary" or "safe zone" for a suspected misdemeanant in these circumstances. Such a view equates law enforcement to sport. Judge Joel C. Neal of the Indiana Court of Appeals may have put it best when he stated:

> Law enforcement is not a child's game of prisoner[']s base, or a contest, with apprehension and conviction depending upon whether the officer or defendant is the fleetest of foot. A police officer in continuous pursuit of a perpetrator of a crime committed in the officer's presence, be it a felony or a misdemeanor, must be allowed to follow the suspect into a private place, or the suspect's home if he chooses to flee there, and effect the arrest without a warrant.

*State v. Blake,* 468 N.E.2d 548, 553 (Ind. Ct. App. 1984). *See also Gasset v. State,* 490 So.2d 97, 98–99 (Fla. Dist. Ct. App. 1986) ("The enforcement of our criminal laws . . . is not a game where law enforcement officers are 'it' and one is 'safe' if one reaches 'home' before being tagged.") (citing *Blake,* 468 N.E.2d at 553).

¶ 134. In sum, hot pursuit of a fleeing misdemeanant, premised upon probable cause, is an exigency sufficient to justify a warrantless home entry and arrest. This view is amply supported by existing Wisconsin case law, the United States Supreme Court, and persuasive authority from other jurisdictions.

### III. CONCLUSION

¶ 135. The majority opinion's conclusion that the circuit court erred when it denied Sanders' motion to

suppress is correct. The searches of Sanders' bedroom and seizure of the evidence found there violated the Fourth Amendment.

¶ 136. I write separately to address the issue that brought this case before us, namely the continuing validity of *Mikkelson*. The facts are undisputed that the defendant in this case committed a jailable criminal offense in the presence of police and that police entered the defendant's house in hot pursuit to effect the defendant's immediate arrest. Entering a home without a warrant under these circumstances is not unreasonable. Entry into a home in hot pursuit to arrest a person on probable cause for a jailable criminal offense is a longstanding, common sense exception to the warrant requirement. Accordingly, I concur.

¶ 137. I am authorized to state that Justices PATIENCE DRAKE ROGGENSACK and ANNETTE KINGSLAND ZIEGLER join this concurrence.

## Appendix

1. Excerpt from Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 310–11 (1967) (Fortas, J., concurring):

> Our Constitution envisions that searches will ordinarily follow procurement by police of a valid search warrant. Such warrants are to issue only on probable cause, and must describe with particularity the persons or things to be seized. There are exceptions to this rule. Searches may be made incident to a lawful arrest, and—as today's decision indicates—in the course of hot pursuit. . . . The use in evidence of weapons seized in a hot pursuit search or search incident to arrest satisfies this criterion because of the need to protect the arresting officers from weapons to which the suspect might resort. The search for and seizure of fruits are, of course, justifiable on independent grounds.

2. Excerpt from Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 321 (1967) (Douglas, J., dissenting):

> The right of privacy protected by the Fourth Amendment relates in part of course to the precincts of the home or the office. But it does not make them sanctuaries where the law can never reach. There are such places in the world. A mosque in Fez, Morocco, that I have visited, is by custom a sanctuary where any refugee may hide, safe from police intrusion. We have no such sanctuaries here. A policeman in hot pursuit or an officer with a search warrant can enter any house, any room, any building, any office. The privacy of those places is, of course, protected against invasion except in limited situations.

3. Excerpt from United States v. Santana, 427 U.S. 38, 43–44 (1976) (White, J., concurring):

> It is not disputed here that the officers had probable cause to arrest Santana and to believe that she was in the house. In these circumstances, a warrant was not required to enter the house to make the arrest, at least where entry by force was not required. This has been the longstanding statutory or judicial rule in the majority of jurisdictions in the United States, see ALI, A Model Code of Pre-arraignment Procedure 306–314, 696–697 (1975), and has been deemed consistent with state constitutions, as well as the Fourth Amendment. It is also the Institute's recommended rule. *Id.*, § 120.6. I agree with the Court that the arrest here did not violate the Fourth Amendment.

¶ 138. LOUIS B. BUTLER, JR., J. (*concurring*). The majority does not determine whether the warrantless entry into Sanders' home to make a warrantless arrest was justified as an exception to the Fourth Amendment warrant requirement. Because this case is resolved on other grounds, we need not (and

313

should not) decide whether the warrant requirement exception for warrantless entry into a home by police engaged in hot pursuit should continue to be limited to warrantless felony arrests or if it should be extended to warrantless serious misdemeanor arrests. While I join the majority opinion, I write separately to address Justice Prosser's concurrence's misreading of pertinent and controlling case law addressing the constitutionality of warrantless home entries.

¶ 139. This case involves one of the most fundamental liberties guaranteed by our federal and state constitutions: the right to privacy in the sanctity of one's home. The United States Supreme Court has explained that "[t]he Fourth Amendment, and the personal rights which it secures, have a long history. At the very core stands the right of a man *to retreat into his own home* and there be free from unreasonable governmental intrusion." *Silverman v. United States,* 365 U.S. 505, 511 (1961)(emphasis added). The Supreme Court also affirmed the fundamental importance of jealously guarding the right to privacy against unwarranted invasions in *McDonald v. United States,* 335 U.S. 451, 455–56 (1948), explaining:

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed *too precious to entrust to the* discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a

magistrate to pass on the desires of the police before they violate the privacy of the home.

*McDonald,* 335 U.S. at 455–56.

¶ 140. In a later case, the Supreme Court elaborated:

> It is axiomatic that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." And a principle protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest.
>
> . . . .
>
> "The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance."

*Welsh v. Wisconsin,* 466 U.S. 740, 748 & n.10 (1984)(quoting *United States v. United States District Court,* 407 U.S. 297, 313 (1972); *Johnson v. United States,* 333 U.S. 10, 13–14 (1948)).

¶ 141. Whether viewed in terms of the protections accorded by the Fourth Amendment to the United States Constitution or by Article I, Section 11 of the Wisconsin Constitution, warrantless entries into the homes of Wisconsin residents are presumptively unreasonable and unconstitutional, with a heavy burden on the government to justify such intrusions of personal liberty and the right to privacy and security in one's home and effects. *See Payton v. New York,* 445 U.S. 573, 581–86 (1980); *State v. Hughes,* 2000 WI 24, ¶¶ 16–21, 233 Wis. 2d 280, 607 N.W.2d 621 (citations omitted). In order to justify the lawfulness of such an entry, the

State must establish both (1) probable cause to arrest or search, and (2) exigent circumstances sufficient to establish an exception to the warrant requirement. *Hughes,* 233 Wis. 2d 280, ¶ 24; *Smith v. Smith,* 131 Wis. 2d 220, 226–28, 388 N.W.2d 601 (1986). "Warrantless entry is permissible only where there is urgent need to do so, coupled with insufficient time to secure a warrant." *Smith,* 131 Wis. 2d at 228.

¶ 142. In *Smith,* this court described the exigent circumstances test as follows: "[w]hether a police officer under the circumstances known to the officer at the time reasonably believes that delay in procuring a warrant would gravely endanger life or risk destruction of evidence or greatly enhance the likelihood of the suspect's escape." *Id.* at 230. As reinforced in later decisions such as *Hughes,* 233 Wis. 2d 280, ¶ 24, the *Smith* decision recognized

> four factors which, when measured against the time needed to obtain a warrant, would constitute the exigent circumstances required for a warrantless entry: (1) An arrest made in "hot pursuit," (2) a threat to safety of a suspect or others, (3) a risk that evidence would be destroyed, and (4) a likelihood that the suspect would flee. *See Laasch [v. State,* 84 Wis. 2d 587, 592, 267 N.W.2d 278 (1978)]. We recommended in *Welsh,* consistent with *Brown v. Texas,* 443 U.S. 47, 50–51 (1979), that a review of exigent circumstances be directed by a flexible test of reasonableness under the totality of the circumstances. [*State v. ]Welsh,* 108 Wis. 2d [319,] 328, 329[, 321 N.W.2d 245 (1982)].

*Smith,* 131 Wis. 2d at 229. The debate presented by Justice Prosser's concurrence comes down to the question of whether the first factor alone, hot pursuit, can constitute such sufficient exigent circumstances under

*Welsh*'s totality of the circumstances test to justify warrantless entry for any misdemeanor offense.

¶ 143. In its *Welsh* decision addressing the constitutional limitations on warrantless home entries, the United States Supreme Court emphasized its hesitation to find exigent circumstances "when warrantless arrests in the home are at issue," and particularly when the underlying offense giving rise to probable cause to arrest "is relatively minor." *Welsh*, 466 U.S. at 749–50 (citing *United States v. Santana*, 427 U.S. 38, 42–43 (1976); *Warden v. Hayden*, 387 U.S. 294, 298–299 (1967); *Schmerber v. California*, 384 U.S. 757, 770–71 (1966); *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)). The *Welsh* court further noted that exceptions to the warrant requirement are "few in number and carefully delineated." *Welsh*, 466 U.S. at 749 (citation omitted). The Court listed the emergency conditions it had previously recognized, and indicated that it had applied only the hot pursuit of a fleeing felon emergency condition to warrantless arrests in the home. *Id.* at 750, 753.

¶ 144. *Welsh* explained the difference between how courts should treat serious and minor offenses in the context of warrantless entry cases in the following terms: "When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate." *Welsh*, 466 U.S. at 750. The Court pointed out that "[e]ven the dissenters in *Payton*, although believing that warrantless home arrests are not prohibited by the Fourth Amendment, recognized the importance of the felony limitation on such arrests. . . . ('The felony requirement guards against abu-

sive or arbitrary enforcement and ensures that invasions of the home occur only in case of the most serious crimes')." *Welsh,* 466 U.S. at 750 n. 12 (quoting *Payton,* 445 U.S. at 616–17 (White, J., dissenting)). The Court ultimately held that the "application of the exigent-circumstances exception in the context of a home entry should *rarely* be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." *Welsh,* 466 U.S. at 753 (emphasis added).

¶ 145. Justice Prosser's concurrence recognizes that *Welsh* distinguishes between different types of offenses. The context in which that distinction was made in *Welsh* was limited, however, to noting that the Court "[did not have] to consider whether the Fourth Amendment may impose an absolute ban on warrantless home arrests for *certain minor offenses.*" *Id.* at 749 n. 11 (emphasis added). The Court also noted that the decision allowing warrantless home arrests upon a showing of probable cause and exigent circumstances, *Payton,* was also "expressly limited to *felony arrests.*" *Id.* (emphasis added).

¶ 146. The Court quoted Justice Jackson's concurrence in *McDonald* in discussing why a finding of exigent circumstances to justify a warrantless home entry should be severely restricted, if allowed at all, when a minor offense has been committed:

> It is to me a shocking proposition that private homes, even quarters in a tenement, may be indiscriminately invaded at the discretion of any suspicious police officer engaged in following up offenses that involve *no violence or threats of it.* While I should be human enough to apply the letter of the law with some indulgence to officers acting to deal with *threats or crimes of violence which endanger life or security,* it is notable that few of the searches found by this Court to be unlawful dealt

318

with that category of crime. . . . While the enterprise of parting fools from their money by the "numbers" lottery is one that ought to be suppressed, I do not think its suppression is more important to society than the security of the people against unreasonable searches and seizures. When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant.

*McDonald,* 335 U.S. at 459–60 (Jackson, J. concurring) (emphasis added). *See also Welsh,* 466 U.S. at 751 (quoting the above passage from Justice Jackson's *McDonald* concurrence). Thus, while the Court discussed the possibility that an argument could be made to extend the *Payton* limitation of felony home arrests upon a showing of probable cause and exigent circumstances to situations involving minor offenses where threats or crimes of violence were involved, the rule established in *Payton* remained in effect for the time being. Moreover, the Court never contemplated home arrests for any type of minor offense that did not involve threats or crimes of violence.

¶ 147. Justice Prosser's concurrence strives to go in a direction never adopted, nor even contemplated, by the Supreme Court. Justice Prosser's concurrence would establish a rule that police in hot pursuit can enter the sanctity of one's home without a warrant for any jailable misdemeanor offense, notwithstanding the fact that the *Payton* rule allowing warrantless entry into the home in some cases was expressly limited to felony arrests. *See Welsh,* 466 U.S. at 749 n. 11.

¶ 148. *Welsh,* while not a hot pursuit case itself, discussed hot pursuit along with the other exigent circumstances that may be factors in a warrantless entry analysis. *Welsh,* 466 U.S. at 749–53. Similarly,

although *Payton* is not a hot pursuit case, its focus dealt with restrictions on warrantless entries into the home.

¶ 149. Justice Prosser's concurrence suggests that the distinction to be drawn in warrantless entry cases is between jailable and nonjailable offenses, completely ignoring the *Payton* limitation. Justice Prosser's concurrence, ¶¶ 83–85. Justice Prosser's concurrence then boldly states that because all misdemeanors are potentially jailable in Wisconsin, then all crimes in Wisconsin are "serious" offenses, *see id.,* ¶¶ 92–94, leading to the necessary conclusion that warrantless entry during hot pursuit is justified for any type of crime whatsoever.

¶ 150. Justice Prosser's concurrence errs by completely misconstruing the case of *Illinois v. McArthur,* 531 U.S. 326 (2001). *McArthur* did not involve a warrantless home entry by police based on probable cause and exigent circumstances for a jailable misdemeanor offense. To the contrary, the police in *McArthur* prevented a defendant from entering his home outside of their presence, precisely so the police *could* secure a warrant prior to entering the home. *Id.* at 328–29. The Court's holding was limited to justifying the restriction upon the defendant's entry into his home that the police imposed. *Id.* at 336. Of particular import is the distinction recognized by the Court that:

> Temporarily keeping a person from entering his home . . . is considerably less intrusive than police entry into the home in order to make a warrantless arrest or conduct a search. Cf. *Payton v. New York*, 445 U.S., at 585 (the Fourth Amendment's central concern is the warrantless entry and search of the home).

*Id.*

¶ 151. In addition to misinterpreting *Welsh* and *McArthur* by concluding that warrantless entry is con-

320

stitutionally permissible for any misdemeanor as long as hot pursuit exists, the analysis in Justice Prosser's concurrence collapsing the distinctions between different types of crimes ignores language to the contrary in other controlling precedents as well. The majority of cases that have addressed the issue of exigent circumstances justifying warrantless home entries distinguish between different types of crimes.

¶ 152. Some cases have maintained the distinction between felonies and misdemeanors. *See, e.g., Welsh,* 466 U.S. at 749 n.11 ("Our decision in *Payton,* allowing warrantless home arrests upon a showing of probable cause and exigent circumstances, was also expressly limited to felony arrests."); *State v. Mikkelson,* 2002 WI App 152, ¶ 17, 256 Wis. 2d 132, 647 N.W.2d 421 (interpreting *Welsh* as "limit[ing] *Santana* to the hot pursuit of fleeing felons"); *see also State v. Sorenson,* 590 P.2d 136, 139 (Mont. 1979)("The [hot pursuit] doctrine is unavailable to peace officers until a felony has been committed and the suspect is fleeing."); *City of Seattle v. Altschuler,* 766 P.2d 518, 520 (Wash. App. 1989)("*Santana's* facts limit its application to the 'hot pursuit' of a fleeing felon."). *But cf. City of Middletown v. Flinchum,* 765 N.E.2d 330, 332 (Ohio 2002)(holding "that when officers, having identified themselves, are in hot pursuit of a suspect who flees to a house in order to avoid arrest, the police may enter without a warrant, regardless of whether the offense for which the suspect is being arrested is a misdemeanor").

¶ 153. Other cases adopt what may be viewed as a "hot pursuit plus" approach that upholds hot pursuits for offenses of varying degrees of seriousness where there are other exigent circumstances present, for example threats of violence or destroyed evidence, or other emergencies or dangerous situations. *See War-*

*den,* 387 U.S. at 297–99 (upholding hot pursuit on the grounds that an armed robbery suspect who had entered a house might "gravely endanger" the lives of officers or other individuals, with speed being of the essence to ensure "that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape"); *Hughes,* 233 Wis. 2d 280, ¶¶ 26–27, 33–35, 39 (The "immediate and compelling" exigent circumstances in that case included probable cause to believe that apartment occupants would intentionally destroy evidence of drug-related offense.); *Butler v. State,* 829 S.W.2d 412, 415 (Ark. 1992)(interpreting the Fourth Amendment as requiring an "exigent circumstance requiring immediate aid or action" beyond a mere hot pursuit where the suspected crime is a minor offense); *State v. Bolte,* 560 A.2d 644, 652–53 (N.J. 1989)(concluding that hot pursuit alone was an insufficient justification for a warrantless arrest in the suspect's home, and describing a series of other cases in which hot pursuit alone was not sufficient without additional exigencies such as the alleged commission of a felony, the potential destruction of evidence, or concern for the safety of others); *State v. Wren,* 768 P.2d 1351, 1352, 1356 & n.5 (Idaho App. 1989)(holding in part "that if an arrest is not initiated in a public place, but is made after a warrantless entry into the home, it may not be justified solely upon a theory of 'hot' or 'fresh' pursuit. Other exigent circumstances must exist." The court, in rejecting a misdemeanor-felony distinction, also rejected hot pursuit as sufficient by itself to justify warrantless entry, explaining that "any simplistic equation of a hot pursuit with an exigent circumstance is conceptually unsound and is at variance with pronouncements of the United States Supreme Court."). *See also Payton,* 445

U.S. at 583 ("[W]e have no occasion to consider the sort of emergency or dangerous situation, described in our cases as 'exigent circumstances,' that would justify a warrantless entry into a home for the purpose of either arrest or search.").

¶ 154. *Santana,* relied upon by Justice Prosser's concurrence and described by that concurrence as a case that does not limit "hot pursuit" warrantless entries to felonies, involved a felony arrest upon probable cause of criminal heroin sales activity, with the Supreme Court holding that in such a context, a defendant cannot defeat an otherwise proper arrest that commenced in a public place by retreating into a private place. *Santana,* 427 U.S. at 39–40, 42–43. *See Welsh,* 466 U.S. at 750 (citing *Santana* as involving "hot pursuit of a fleeing felon"). The Court described the chase in that case as "a true 'hot pursuit' " because there was a realistic expectation that if the police did not follow Santana into her house, "any delay would result in a destruction of evidence." *Santana,* 427 U.S. at 42–43. As such, it was the likelihood of the destruction of drug evidence, rather than any actual chase,[1] that caused the Court to conclude that warrantless entry was justified in that felony case.

¶ 155. However, *Santana* has not been applied to warrantless misdemeanor arrests inside a home by the Supreme Court; notwithstanding *Santana,*[2] the Court in *Welsh* did emphasize that *Payton* was limited to

[1] Indeed, there was no literal chase involved in *Santana;* as Justice Marshall's dissent points out, Santana was already standing in her doorway when the police approached her home to arrest her. *United States v. Santana,* 427 U.S. 38, 45–47 (1976)(Marshall, J., dissenting).

[2] *Welsh v. Wisconsin,* 466 U.S. 740 (1984), was decided subsequent to *Santana.*

felonies. *Welsh,* 466 U.S. at 749 n. 11. Absent further action by the Supreme Court, this court lacks the constitutional authority to create a new rule of law that would abandon the precedent of *Payton.*

¶ 156. In denying all criminal suspects in Wisconsin the right to a warrant before being hotly pursued right into their own home, Justice Prosser's concurrence would accord fewer protections to individuals to be secure in their homes and persons than those recognized by the United States Supreme Court. Such denial of fundamental Fourth Amendment rights would be in clear contravention of the basic constitutional principle that the federal Constitution sets the floor, not the ceiling for individual rights, and states may not provide fewer constitutional protections than those guaranteed by the federal constitution, although we are always free to grant more rights under our state's constitution. *See* U.S. Const. art. VI, cl. 2; *State v. Young,* 2006 WI 98, ¶ 30 & n. 9, 294 Wis. 2d 1, 717 N.W.2d 729.

¶ 157. Finally, Justice Prosser's concurrence confuses and conflates "minor" with "petty" misdemeanors, in its analysis that our legislature "has determined that *all* misdemeanors, regardless of class, are 'serious' offenses" simply "because all misdemeanors are jailable offenses." Justice Prosser's concurrence, ¶ 92. Justice Prosser's concurrence ignores the fact that the United States Supreme Court has already distinguished "serious" offenses from "petty offenses," not in terms of whether any jail time at all may be a penalty, but in terms of how much maximum jail time may be imposed. Specifically, the Supreme Court has explained that:

> [i]n deciding whether an offense is "petty," we have sought objective criteria reflecting the seriousness with

324

which society regards the offense, and we have found the most relevant such criteria in the severity of the maximum authorized penalty. Applying these guidelines, we have held that a possible six-month penalty is short enough to permit classification of the offense as "petty," but that a two-year maximum is sufficiently "serious" to require an opportunity for jury trial. . . .

*Baldwin v. New York,* 399 U.S. 66, 68–69 (1970)(citations omitted). Other cases in which the Court has explained that offenses are presumptively "petty," as opposed to "serious" offenses, if the maximum potential sentence is six months or less, include *United States v. Nachtigal,* 507 U.S. 1, 3–4 (1993), and *Blanton v. City of North Las Vegas,* 489 U.S. 538, 542–43 (1989).

¶ 158. In closing, although the proposal of Justice Prosser's concurrence—denying the Fourth Amendment right to be protected from literally unwarranted intrusions into the sanctity of one's home in any misdemeanor involving hot pursuit—is contrary to established legal standards, I again emphasize that we need not decide whether a warrantless entry into a home by police officers in the context of hot pursuit should continue to be limited to warrantless felony arrests or if the hot pursuit exception to the warrant requirement should be extended to serious misdemeanor arrests. The majority correctly decided this case on narrower grounds.

¶ 159. For the foregoing reasons, I respectfully concur.